UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-60034-CR-ALTMAN

UNITED STATES OF AMERICA,

     *Plaintiff*,

v.

ELVIN I. LEWIS, JR.,

     *Defendant*.

_____/

## ORDER

A federal jury convicted the Defendant, Elvin I. Lewis, Jr. ("Lewis"), of one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and ten substantive counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). *See* Verdict [ECF No. 83]. After the verdict, and pursuant to the provisions of 18 U.S.C. § 3143(a), the Court remanded Lewis into the custody of the U.S. Marshal.

On March 3, 2020, Lewis filed a Motion for Bond Pending Sentencing (the "Motion"). [ECF No. 136]. In his Motion, Lewis asks the Court to release him because (he says) he is neither a danger to the community nor a flight risk. *Id*. at 3. The Court denied the Motion in a paperless order on March 5, 2020. [ECF No. 137]. Lewis appealed that paperless order (the "Notice of Appeal") [ECF No. 148], and, on August 13, 2020, the Eleventh Circuit issued a limited remand, in which it instructed this Court to "state in writing, or orally on the record, the reasons for" the Motion's denial. Appeals Order [ECF No. 182] at 2 (quoting FED. R. APP. P. 9(a) ("The district court must state in writing, or orally on the record, the reasons for an order regarding the release or detention of a defendant in a criminal case."). Soon after, the United States (the "Government")

filed its Opposition to the Motion. [ECF No. 186]. For the reasons set out below, the Motion is **DENIED**.

## The Facts

Over the course of nearly a year, Elvin Lewis laundered millions of dollars—money that, he knew, had been stolen from unsuspecting victims. *See generally* Presentence Investigation Report (the "PSI") [ECF No. 174]. Beginning in November of 2017, Lewis worked for a man he called "Wancai" and (later) "Mr. Chong," even though the man identified himself as "Victor Radoslaw." *Id.* ¶ 7. Working with Radoslaw, Lewis and his co-conspirators wired a significant portion of the fraudulently obtained funds abroad to China; directed funds totaling more than $1 million into domestic accounts under Lewis' (and his co-conspirators') control; withdrew funds in cash; and then converted the fraud proceeds into cashier's checks. *Id.* ¶ 21. All told, Lewis laundered approximately $3,193,824 in fraud proceeds. *Id.* ¶ 22–23. In return, Lewis received five-to ten-percent of the money he laundered. *Id.* ¶¶ 8, 16–17.

The trial record established that the fraudulently obtained funds came from a series of business email compromise ("BEC") scams whose victims spanned multiple states. *See id.* ¶¶ 4–5. Lewis' co-conspirators hacked into the victims' computers and, pretending to be the victims, directed the victims' business clients to send payment to newly established accounts—accounts that, unbeknownst to the victims' clients, were created and operated, not by the victims, but by Lewis. *Id.* ¶ 4. Once the victims' clients wired their money to these accounts, Lewis began laundering the funds through a complex web of domestic and Chinese accounts. *Id.* ¶¶ 10, 21.

Lewis' text messages—introduced at trial—revealed that, over time, he grew more and more ambitious: He began, for instance, to demand a bigger share from Radoslaw, and he even accepted other offers from unknown individuals to launder their money through domestic real

estate transactions. *Id*. ¶ 27. Indeed, even after several U.S. banks flagged his accounts for fraud—and after federal agents searched his business and froze his accounts—Lewis simply opened new accounts and brazenly continued his laundering activities. *See* Response to Defendant's Objections to PSI [ECF No. 171].

During this time, Lewis recruited Vanna Clay ("V.C.") to help him with his scheme. PSI ¶ 24. Lewis instructed her to open accounts, taught her how to launder money, and directed her to conduct laundering transactions. *Id*. ¶ 24. Throughout June and July of 2018, Lewis and Radoslaw routinely texted (sometimes openly) about those laundering transactions, which by now totaled more than $2,000,000. *Id*. ¶ 22. As Lewis' scale grew, so did his cut, which now rose to eight percent (or $165,000). *Id*.

On January 31, 2019, a grand jury in the Southern District of Florida charged Lewis with one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 1); and ten substantive counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Counts 2 through 11). *See* Indictment [ECF No. 1]. On October 11, 2019, after a week-long trial, a federal jury convicted Lewis on all eleven counts of the Indictment. *See* Jury Verdict [ECF No. 83].

On March 3, 2020, Lewis filed this Motion. On September 20, 2020, he submitted a Supplement to Motion for Bond Pending Sentencing [ECF No. 190], in which he argued that the ongoing COVID-19 pandemic, coupled with his own health conditions,[1] justified his release. This Order follows.

---

[1] Lewis says he suffers from high blood pressure, asthma, shortness of breath, and large tumors in his left leg. *See generally* Supplement.

**The Law**

The provisions of 18 U.S.C. § 3143(a), which govern the release of a convicted defendant pending sentencing, create a presumption in favor of detention. *See e.g., United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004) ("[T]he Bail Reform Act of 1984 creates no general expectation of post-verdict liberty. To the contrary, it establishes a presumption in favor of detention."); *United States v. Giancola*, 754 F.2d 898, 902 (11th Cir. 1985) (Under the Bail Reform Act, "the conviction is presumed correct and the burden is on the convicted defendant to overcome that presumption"). To overcome that presumption, Lewis must show with "clear and convincing evidence that [he] is not likely to flee or pose a danger to the safety of any other person or the community if released[.]" 18 U.S.C. § 3143(a)(1); *see also* FED. R. CRIM. P. 46(c) ("The burden of establishing that the defendant will not flee or pose a danger to any other person or to the community rests with the defendant.").

**Analysis**

Lewis has not met his burden of proving either that he will not flee or that he no longer poses a danger to his community. To the contrary, for the following *five* reasons, the Court is left with the "definite and firm conviction" that Lewis poses both a flight risk and a danger to his community. *United States v. Grobman*, 2020 WL 3286039, at *4 (S.D. Fla. Apr. 24, 2020) (revoking the defendant's bond pending sentencing because he failed to demonstrate that he was not a flight risk (quoting *United States v. Pollock*, 2014 WL 5782778, at *1 (M.D. Fla. Nov. 6, 2014))).

*First*, Lewis has every incentive to flee. According to the PSI, Lewis faces an advisory guidelines range of 108–135 months. *See* Opposition to the Motion [ECF No. 186]. And, while Lewis counters that his offense level should be 24 (rather than 31), *see* Objections to the PSI [ECF

No. 168], his rosier view of the facts would still result in a guidelines range of 51–63 months—more time than he's ever spent in prison before.[2] The very real prospect of spending the next five to eleven years in prison would give anyone second thoughts about staying put. *Cf. United States v. Bonilla*, 388 F. App'x 78, 80 (2d Cir. 2010) (recognizing the self-evident proposition that a lengthy prison term "provides a strong incentive for [a defendant] to flee").

*Second*, Lewis has a history of violating the conditions of his probation by, for example, failing to "promptly and truthfully answer the inquiries of the probation officer" and "fail[ing] to make restitution payments." PSI ¶ 47. Lewis' "fundamental lack of respect for the rule of law" undermines his claimed willingness to abide by any bond conditions the Court might impose. *United States v. Norman*, 2009 WL 464078, at *3 (S.D. Fla. Feb. 24, 2009).[3]

*Third*—and relatedly—this wasn't Lewis' first run-in with the law. In fact, when Lewis got involved in *this* conspiracy, he had already been arrested and sentenced for a separate crime involving deception. *See* PSI ¶ 47 (noting that adjudication of the case was withheld). That Lewis began actively participating in an international fraud scheme just two or three years after a prior theft case strongly suggests that he's unlikely to abide by any bond conditions the Court might impose.

---

[2] The Court here makes absolutely no judgments about Lewis' sentencing, and nothing in this Order is intended to suggest otherwise. The Court simply highlights the uncontroversial proposition that, however much either side may believe in the correctness of its sentencing position, the Court must make the ultimate decision after considering several factors—one of which, of course, is the advisory guidelines range.

[3] Lewis' compliance with the law during trial does not prove otherwise. *See United States v. Elso*, 2008 WL 11407297, at *1 (S.D. Fla. June 25, 2008) ("Defendant notes that he has not attempted to flee during his incarceration. While commendable, this observation is insufficient to overcome the record evidence demonstrating the likelihood of flight."). Hope, after all, springs eternal—and Lewis may well have believed that the jury would find him not guilty. If he did harbor this (mistaken) belief, fleeing pre-trial would have made little sense.

*Fourth*, Lewis was convicted of a scheme *premised* on widespread deception. The trial evidence established that Lewis repeatedly lied to banks, deceived V.C., and continued to find new (and ingenious) ways to launder Radoslaw's money *even after* the banks had flagged—and closed—his accounts. This "pattern of deception," which involved "methodical and repetitive efforts to defraud and evade detection," indicates "that [he] would continue to pose a danger of further harm to the community if released." *United States v. Burke*, 2013 WL 5194138, at *1 (S.D. Fla. Sept. 17, 2013).

*Fifth*, Lewis laundered some three-million dollars—a crime spree that netted him substantial seven-figure profits, more than enough to sustain him on the run. *Cf. Matter of Extradition of Ricardo Alberto Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1304 (S.D. Fla. 2017) (citing several cases for proposition "that defendants with financial means to flee pose a serious risk of flight"). And, while Lewis now claims that he's indigent—and that he thus lacks the means to sustain himself on the lam—this Court is not prepared to take him (a convicted money launderer) at his word.

Against all this, Lewis advances three arguments—all unpersuasive.

*First*, Lewis tries to rebut the presumption in favor of detention by minimizing his criminal culpability—suggesting, in this regard, that his was *merely* an "economic," rather than a violent, offense. Mot. at 3. But "courts are not confined in such cases to considering only the harms involving an aura of violence." *United States v. Provenzano*, 605 F.2d 85 (3d Cir. 1979). And the law is clear that a defendant who poses an economic threat—like a violent felon—*can* constitute a "danger" to his community. *See United States v. Wilkes*, 2008 WL 481942, at *1 (S.D. Cal. Feb. 19, 2008) (denying post-conviction motion for bond and concluding that a defendant convicted of bribery, money laundering, and wire fraud posed a "danger" to his community (citing *United States*

*v. Reynolds*, 952 F.2d 192 (9th Cir. 1992))). Lewis' victims would be (justifiably) surprised to learn that Lewis views himself—and his esurient schemes—as <u>non</u>-dangerous. The Court now wholly rejects the (baseless) notion that a convicted money launderer who deploys no violence is thus not dangerous.

*Second,* Lewis relies on *United States v. Etienne*, 2018 WL 1309904 (S.D. Fla. Mar. 12, 2018), for the proposition that his family ties to South Florida rebut the risk-of-flight presumption. *See* Mot. at 2–3. But the defendant in that case had accepted responsibility for his crimes, pled guilty, and cooperated against his co-defendants. *See United States v. Etienne*, 2018 WL 1281803, at *1 (S.D. Fla. Mar. 8, 2018), *report and recommendation adopted*, 2018 WL 1309904. Lewis, by contrast, was convicted by a jury after a lengthy trial, has cooperated against no one, and— ignoring the mounds of overwhelming evidence the Government presented at trial—continues to protest his innocence. It is, by now, well-settled that defendants who accept responsibility and cooperate against their co-defendants are differently situated from those who don't. *See , e.g.*, *United States v. Docampo*, 573 F.3d 1091, 1101–02 (11th Cir. 2009) ("Because [Docampo] did not provide any assistance to the government, there was no unwarranted disparity between his and [his cooperating co-conspirators'] sentences." (cleaned up)); *United States v. Price*, 644 F. App'x 875, 879 (11th Cir. 2016) (unpublished) ("Defendants who cooperate with the government are not similarly situated to those defendants who do not."). In any event, when weighed against the significant prison sentence he's facing, the substantial sums of money he stole, his prior history of violating the law, and the sophisticated scheme of deception he perpetrated, Lewis' familial ties come nowhere close to overcoming the Bail Reform Act's presumption in favor of detention.

*Third*, in his Supplement, Lewis contends that his underlying health conditions make him especially vulnerable to COVID-19. *See generally* Supplement; Elvin Lewis' Affidavit [ECF No.

190-1]; Rhona Lewis' Affidavit [ECF No. 190-2]. For *three* reasons, Lewis' supplemental request is unavailing.

*One*, Lewis provides little evidence to support his view that his confinement increases his risk of *contracting* COVID-19. *See generally* Emergency Motion for Release Pending Appeal of Detention Order [ECF No. 155]; Memorandum of Law in Support of Emergency Motion for Release Pending Appeal [ECF No. 163]; Supplement. Lewis, in fact, never mentions the significant COVID restrictions that have been implemented at the Paul Rein Detention Facility, does not explain the exposure levels of the people he proposes to live with (if released), and thus fails to establish that releasing him would put him at a *lower* risk of contracting COVID-19.

*Two*, Lewis has not demonstrated that his conditions—even taken together—rise to "an acute level warranting his release." *United States v. Esformes*, 16-20549-CR-SCOLA, at 3 (S.D. Fla. Apr. 9, 2020), ECF No. 1491. Although Lewis suffers from several pre-existing conditions, like asthma and shortness of breath,[4] "virtually every person over the age of 50 has some health condition that could conceivably put that person at a greater risk of succumbing to the coronavirus, but this does not entitle every inmate over 50 to be released." *Id.*; *see also United States v. Hylander*, 2020 WL 1915950 (S.D. Fla. Apr. 17, 2020) (denying compassionate release to a 66-year-old, pre-diabetic defendant whose other conditions placed him within the CDC's at-risk population); *Grobman*, 2020 WL 3286309 (denying pre-sentencing release to a 44-year-old defendant with pre-diabetes and lupus).

---

[4] "Currently there are limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19. Based on what [the Centers for Disease Control (CDC)] knows at this time, adults of any age with the following conditions—including asthma—*might* be at an increased risk for severe illness from the virus that causes COVID-19." People with Certain Medical Conditions, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. (last modified Oct. 6, 2020) (emphasis added).

*Three*, Lewis does not dispute that he suffered from these very same conditions when he was working to steal the victims' hard-earned money. "The Court cannot agree that a defendant who is physically and mentally well enough to commit a serious federal crime is somehow not well enough to serve the sentence to which that crime inevitably exposes him." *United States v. Stuyvesant*, 454 F. Supp. 3d 1236, 1244 (S.D. Fla. 2020).

The Court is not unsympathetic to Lewis' plea. Nor does the Court mean—in any way—to minimize the threat COVID-19 poses to inmates, like Lewis, who are (of necessity) in close quarters with others. But the Court must apply the law to the facts. And those facts are dispositive here. Lewis has every incentive to flee: he's young, and he's facing a substantial prison term. He's also demonstrated a callous willingness—over many years—to defraud others and to disregard the law when doing so was in his own best interests. To give *this Defendant*, in *these circumstances*, a bond—because he *may* (one day) get sick—would be to allow (almost) every non-violent defendant in the country out onto the streets. This the Court will not do.

***

Having carefully reviewed the Motion, the Supplement, the record, and the governing law, the Court hereby

**ORDERS and ADJUDGES** that the Motion [ECF No. 136] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 23rd day of October 2020.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**